## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | SA-04-CR-517-XR |
| v. | § | |
| | § | |
| ELIAS RODAS (2), | § | |
| | § | |
| *Defendant*. | § | |

## ORDER ON MOTION TO DISMISS INDICTMENT

On this date, the Court considered Defendant's motion to dismiss his indictment for violation of the Sixth Amendment right to a speedy trial (docket no. 81), the Government's response (docket no. 84), Defendant's reply (docket no. 87), and the Government's reply (docket no. 88). After careful consideration, Defendant's motion is GRANTED.

## BACKGROUND

### I.    The Alleged Crime (2004)

This case concerns an undercover drug bust that occurred nearly 16 years ago. In early September 2004, the Drug Enforcement Agency ("DEA") initiated an investigation into a cocaine trafficking organization allegedly led by co-defendant Mario Garza ("Mario Garza"). Docket no. 84-1 at 1. On September 15, 2004, DEA Special Agent Jaime Garza ("SA Garza"), acting in an undercover capacity, met with Mario Garza in a restaurant, where Mario Garza expressed interest in purchasing a large quantity of cocaine. *Id.* at 10. Mario Garza and SA Garza discussed details of the transaction inside the restaurant, upon which Mario Garza informed SA Garza that his "right-hand man" was in a vehicle outside. *Id.* An affidavit from that time reveals the DEA was aware that the right-hand man, Defendant, went by either "Elias Rodas," "Marvin Sanchez," or

"Chikies." *Id.*; docket no. 84-1 at 3. Mario Garza instructed Defendant to hand over a bag containing approximately $30,000 to SA Garza as a "security deposit" for the anticipated deal. Docket no. 81-2 at 2; no. 84-1 at 8. The parties agreed to later meet with Agent Garza in Houston to complete the transaction. *Id.* Mario Garza then provided SA Garza with Defendant's cellphone number. *Id.* at 13. Surveillance footage revealed a Nissan Quest driven by and registered to Elias Rodas at 2012 Shearn, Houston, Texas. *Id.* at 16, 18.[1] Later that day, Mario Garza met with SA Garza to view the cocaine; Defendant was not present. *Id.* at 12. After this meeting, another Special Agent sent a photograph of Defendant to the DEA's New Orleans Office, and an officer there confirmed that Defendant was "Marvin Sanchez" and provided a known phone number for Marvin Sanchez which matched the number previously provided to SA Garza. *Id.* at 16.

On September 17, 2004, after a series of phone calls between Mario Garza and SA Garza, Defendant and Mario Garza arrived at the Katy Mills Mall parking lot in Katy, Texas. *Id.* at 20. Mario Garza spoke on the phone with SA Garza, informing SA Garza that the cocaine was in a nearby car driven by co-defendant Roberto Velasquez ("Velasquez"). *Id.* SA Garza met with Velasquez in the parking lot and asked where Mario Garza and Defendant were, but Velasquez did not know. *Id.* Mario Garza had previously informed SA Garza that he would be within viewing distance of the transaction. SA Garza opened the trunk of Velasquez's car and found what was later determined to be $689,967 cash. SA Garza then gave the arrest signal, and Velasquez—but only Velasquez—was arrested. *Id.*[2]

---

[1] Defendant's wife does not remember either she or her husband ever owning a green Nissan Quest. Docket no. 87-1 at 1.

[2] The Government's briefing states that after Velasquez's arrest, "efforts were made to locate and arrest" Mario Garza and Defendant, but the evidence to which the Government cites (docket no. 84-1 at 19–27) does not support that assertion, aside from indicating that a DEA Special Agent showed Velasquez a photo of Mario Garza, and Velasquez was able to positively identify the person as Mario Garza. *Id.* at 25 ¶ 4. It

That same day, September 17, 2004, an arrest warrant was issued for Mario Garza and Defendant (named as "Elias Rodas, aka Marvin Sanchez") for violations of 21 U.S.C. §§ 846, 841(a)(1). Docket no. 81-1 at 2. Without describing the attempt, the DEA report notes that "an attempt to serve the warrant was made," but neither Defendant nor Mario Garza were located. Docket no. 84-1 at 28. On September 28, 2004, apprehension responsibility for Defendant was turned over to the United States Marshals Service ("USMS"). Docket no. 81-6 at 2. On October 6, 2004, all three defendants (Defendant, Mario Garza, and Roberto Velasquez) were indicted for conspiracy to possess with intent to distribute. Docket no. 3. Velasquez later pleaded guilty and was sentenced to 87 months imprisonment. Docket no. 20–30.[3]

## II.    Efforts to Apprehend Defendant (2005–2019)

An April 2005 report shows that the USMS obtained Defendant's Social Security Number ("SSN") through his Texas driver's license application. Docket no. 84-1 at 29. That report indicates two possible names for Defendant: Elias Rodas and Marvin Sanchez. *Id.* The USMS discovered that "someone using Defendant's information" had reported wages the prior year at a grocery business in Houston. *Id.* The USMS went to that location and learned that a person named Elias Rodas was scheduled to work the following day; the manager also provided an address for that person. *Id.* at 30. That evening, the USMS went to that address and encountered not Defendant but rather Defendant's brother, Mario Sanchez. *Id.* He informed the USMS that Defendant's true and full name was "Marvin Jeovani Sanchez Padilla" and that he sometimes went by "Chiqui." *Id.* He

---

is unclear, then, if there was surveillance on either Mario Garza or Defendant and if the Government attempted to find either at the time Velasquez was arrested, given that the Government knew Mario Garza and Defendant were in the Katy Mills Mall parking lot and that Mario Garza "had access in viewing" the cocaine transaction, i.e. that he was nearby. *See id.* at 20 ¶ 6.

[3] Mario Garza was arrested in Houston in December 2008 and was sentenced by the Southern District of Texas to 48 months imprisonment. Docket no. 84-4 at 2.

further informed the USMS that Defendant was in a relationship with "Tina Menjivar" and was living in Honduras. *Id.*[4] The USMS identified and obtained contact information for Defendant's then-girlfriend's mother (Onelia Menjivar), Defendant's mother (Cleotilde Padilla), another brother living in Honduras (Dora Padilla), the apartment's owner (Julio Montoya), and the listed apartment resident (Marlene Menjivar).[5]  It is now known that Marlene and Tina Menjivar are the same person: Defendant's then-girlfriend and now wife. *See* docket no. 87-1 at 2.

The Government's brief then concedes that "[f]rom [April 2005] until March 2018, the search for the Defendant slows to a crawl with the Marshal's Service making periodic database searches to see if the Defendant had returned to the United States." Docket no. 84 at 8–9. A USMS report from 2007 shows that the DEA was "willing to foot the bill" for Defendant's extradition if he were to be found in an extraditable country (Honduras refused to extradite its own citizens). *Id.*

---

[4] This evidence is raised in Defendant's reply brief.  Defendant argues this constitutes exculpatory evidence not previously revealed to Defendant in violation of *Brady*. Defendant's reply includes an affidavit explaining that the USMS reports were supplied to Defendant for the first time in response to Defendant's speedy trial motion. Docket no. 87-2. Defendant argues that this evidence is exculpatory in that it reveals Defendant's brother was using Defendant's identification at the same time that someone was using Defendant's identification is accused of committing the instant crime. Docket no. 87 at 6. It also reveals that the Government knew of the need to interview Defendant's then-girlfriend but did not do so. Defendant argues this nondisclosure prejudiced him in that it gives him an "identity defense" that was not available for the 15 years since the Government obtained this evidence. Further, Defendant's sole course of defense, he alleges, will now be testimony from his wife that Defendant and Defendant's brother look similar and could thus have been confused at the time. Defendant claims "this is not the quality of evidence that would have existed" if Defendant had been aware of the identity defense before now.

The Government explains in its latest reply brief that the late disclosure was a result of receiving new documents from the U.S. Marshal's Service and those documents were promptly produced to the Defendant.   The Court finds that no *Brady* violation occurred.

[5] The USMS report suggests that Marlene may actually be Tina, Defendant's long-term girlfriend. The report notes that she should be interviewed; the record does not reflect that was ever done. Docket no. 84-1 at 30. An affidavit from Defendant's wife, Marlene Sanchez, confirms that she previously went by the name "Tina Menjivar"—the "Tina" is a nickname representing her middle name (Argentina), and "Menjivar" was her first husband's last name. Her maiden name is "Cribas." Docket no. 87-1 at 2. Marlene confirms that no one, aside from Defendant's counsel, has ever interviewed her. *Id.*

4

at 32. A 2009 report indicates that an INTERPOL "Red Notice" was put out but that there were no responses. *Id.* at 33. But a 2011 report requests that the Government "finish up a portion of the Red Notice so that it can be submitted." *Id.* at 36.[6] Another 2011 report shows continued discussion as to whether the U.S. Attorney's Office would fund an extradition and remarks that a Special Agent "would contact the DEA agents in Honduras to have them discretely locate the fugitive." *Id.* at 38. But, that same report notes, any decision as to (1) extradition funding or (2) identifying Defendant's location in Honduras was stalled as the Agent awaited further information on funding. *Id.* Reports from the subsequent years show a database check each year, none of which found any further information until 2018, when a case review discovered that Defendant's now wife was shown to have an active address in Houston. *Id.* at 45.

Notwithstanding the DEA's yearly reports and database checks, Defendant traveled to the United States and was apprehended by a Border Patrol Agent in the Rio Grande Sector on April 21, 2014.[7] He produced two Honduran identification cards, each with the name "Marvin Giovanny Sanchez Padilla." Docket no. 84-2 at 14. When asked if he had any other names, Defendant responded that he previously used the name Hector Fernando Vasquez Padilla, the name used on his Texas ID card in 2002. Docket no. 84-2 at 16; *see infra*, note 7. He did not, however, reveal that he had also used the name Elias Rodas. At that time, the DEA was still looking for Defendant under two names: (1) Elias Rodas or (2) Marvin Jeovani Sanchez Padilla. Docket no. 84-1 at 30.

---

[6] The Government does not provide any exhibit proving the existence of that INTERPOL Red Notice.

[7] This was not Defendant's first encounter with immigration authorities. In 2002, he was arrested (but not charged) during an automobile theft investigation. At that time, he had a Texas ID card in the name of "Hector Fernando Vasquez Padilla" with a DOB of 11/30/75. Docket no. 84-2 at 4. He was released on bond and agreed to a voluntary return to Honduras, though the Government concedes that whether he returned to Honduras at that time is unknown. What is known is that a year later, Defendant acquired a driver's license in the name of Elias Rodas. Docket no. 84-1 at 18.

In his immigration interview, he stated that he is from Choloma, Cortes, Honduras, the same location that a 2011 DEA report presumed that Defendant lived at the time the DEA was seeking his return to the United States.[8] Docket no. 84-1 at 37 (DEA report); no. 84-2 at 16 (DHS report). On May 14, 2014, an Asylum Officer determined that Defendant presented a "credible fear" claim for asylum and released him on bond on May 28. Docket no. 81-7 at 2. Marlene A. Cribas Mejia, now known to be Defendant's wife, was the obligor on that bond; she presented two forms of identification showing that name. Docket no. 84-2 at 25. She also presented a Social Security card bearing the same SSN as that associated with "Marlene Menjivar", the person the USMS identified in 2005 as "associated with" the residence at which Defendant's brother was found, and the person that USMS indicated needed to be interviewed at the time but for whom no interview was conducted. *See* docket no. 84-1 at 30; no. 84-3 at 15; no. 87-1 at 2.[9]

## III.    Defendant's Arrest and Pre-Trial Proceedings (2019–2020)

In 2018, a Deputy U.S. Marshal conducted another case review, this time discovering the current address for Defendant's wife, Marlene Sanchez, formerly Marlene A. Cribas Mejia. The USMS pulled Marlene Sanchez's 2016 driver's license application which showed Defendant (listed as Marvin Sanchez) as her emergency contact. Docket no. 84-1 at 45. The Marshal contacted both DEA and ICE to obtain fingerprints, which neither had because (1) the DEA never arrested

---

[8] When providing his other used name, Hector Fernando Vasquez-Padilla, Defendant gave a DOB of 11/30/76, i.e. a year later than the birthdate shown on Hector's Texas ID card. *See* docket no. 84-2 at 1, 16. It is also different than the birthdate listed on Marvin Giovanny Sanchez Padilla's Honduran ID cards. *Id.* at 14 (DOB 10/28/71).

[9] DPS records show that Marlene Cribas Mejia and Marvin Giovanny Sanchez Padilla married in Honduras in 2008. Docket no. 84-3 at 22. Now Marlene Sanchez, she was naturalized in 2016. *Id.* at 14. The Government contends that this was the first time Marvin Sanchez was associated with Marlene Cribas (now Marlene Sanchez) in Texas DPS files. Docket no. 84 at 11.

Defendant in 2004 and, thus, had no fingerprints, and (2) Defendant's immigration records were under the names Hector Fernando Vasquez-Padilla and Marvin Giovanny Sanchez-Padilla, and those immigration records had a different date of birth. *Id.*

On January 15, 2019, a Deputy U.S. Marshal obtained driver's license information, including thumbprints, on Elias Rodas from Texas DPS. *Id.* at 46, 51. Believing that Marvin Sanchez was, in fact, Elias Rodas, the Marshal requested the USMS in Houston arrest Defendant, which they did on January 30, 2019. *Id.* at 49. The Government claims, without citation, that the thumbprints from the arrest of Marvin Sanchez matched those on file from Elias Rodas. Docket no. 84 at 12. Thereafter, Defendant's counsel requested numerous continuances both of the plea agreement deadline and the jury trial date. Ultimately, Chief Judge Garcia's "Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 Pandemic" continued all deadlines in this case. Docket no. 80. The trial in this case is now set for August 17, 2020. *Id.* at 2. On May 1, 2020 Defendant brought the present motion to dismiss for speedy trial delay. Docket no. 81.

## DISCUSSION

### I.    Applicable Law

To determine whether a defendant's right to a speedy trial has been denied so as to justify the dismissal of the indictment, a court must evaluate and balance four factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's diligence in asserting his Sixth Amendment right, and (4) prejudice to the defendant resulting from the delay. *Barker v. Wingo*, 407 U.S. 514, 530 (1972); *United States v. Serna-Villarreal*, 352 F.3d 225, 230 (5th Cir. 2003).

## II.    Application

Defendant argues that the delay between his indictment and the present violates his Sixth Amendment right to a speedy trial. As to the first factor—the length of delay—Defendant argues that the delay between Defendant's indictment and arrest is approximately fourteen years which is more than sufficient to trigger the *Barker* balancing test. Docket no. 81 at 6–7. Defendant further argues on this prong that the delay between his arrest and the present day is approximately fifteen months, long enough itself to trigger *Barker* balancing.[10]

As to the second factor—the reason for the delay—Defendant argues that the Government has not provided a reason for (1) the decision not to arrest Defendant when the case was first indicted or when the arrest warrant was first issued, and (2) the failure to arrest Defendant when he was in immigration custody or thereafter living on the United States on bond. *Id.* at 7. Defendant concedes that the delay was not undertaken in bad faith but that it instead constitutes a "middle ground of official negligence" and that "where the prosecution occupies" such a middle ground, "the longer the delay is protracted[,] the less it should be tolerated." *Id.* (citing *United States v. Serna-Villarreal*, 352 F.3d 225, 232 (5th Cir. 2003) ("If a case involves neither diligent prosecution nor bad faith delay but instead official negligence, the case occupies a 'middle ground' where the weight assigned to the [prejudice] factor increases as the length of the delay increases."))[11] In other words, the longer the delay, the less governmental negligence will be

---

[10] To the extent that the Defendant is raising this as an independent basis for a Speedy Trial Act violation, that is overruled. Any delay during this time period results from continuances sought or agreed to by Defendant or the COVID-19 pandemic.

[11] Defendant does not expressly address the third factor—"the defendant's diligence in asserting his Sixth Amendment right." Rather, Defendant contends that the reason he has requested several continuances is due to his "being forced to decide between going to trial based on incomplete evidence or waiting to make that determination until the discovery is complete." Docket no. 81 at 8. Though that may be true, that does

tolerated.

On this second factor, the Government argues that the failure to arrest Defendant was simply because authorities could not locate him, given the varying names he used. Docket no. 84 at 12. Further, the Government argues that Defendant was not arrested at the time of the drug transaction because "[o]bviously, [the Government] wanted to seize the nearly $700.00 [sic], and they wanted to identify and arrest all that were involved." *Id.* at 13. The Government further argues that the Deputy Marshals were reasonably diligent in that they made "regular and periodic checks" from 2005 onwards, which ultimately paid off in 2019. *Id.*

As to the final factor—prejudice resulting from the delay—Defendant argues first that where the delay is "excessively protracted," prejudice can be presumed. Docket no. 81 at 9 (citing *United States v. Frye*, 489 F.3d 201, 209 (5th Cir. 2007) ("[T]he length of delay will generally not create a presumption of prejudice unless the post-indictment delay lasted at least five years.")). Alternatively, Defendant argues that he has shown prejudice resulting from the delay. Defendant argues that if he had been arrested soon after the indictment, he could have presented several defenses which are no longer available. *See* docket no. 81 at 10. For example, if Defendant sought to establish that another person was using Defendant's identity, he could have gone through records to determine if he could have been in San Antonio when the alleged transaction occurred, but that the 15-year delay makes this reconstruction impossible. *Id.*; *see also* docket no. 87-1 at 3 ("I am confident that, if Marvin had been arrested [in 2014], I would have had more success reconstructing our lives as they were back in September of 2004."). This identity defense, Defendant argues, is further prejudiced in that Defendant can no longer make as strong of an

---

not respond to the issue of why Defendant did not file this motion in the fifteen months since his arrest.

argument regarding any possible confusion between Defendant's brother (who was using Defendant's SSN at the time) and Defendant. Docket no. 87 at 6. A "mere presence" defense is also made impossible, Defendant argues, because phone, employment, and bank records either no longer exist or have not been disclosed by the Government. Thus, Defendant argues, he is left solely with the testimony of his wife to argue that "he was not living a life that would allow him to also be the leader of a drug conspiracy." Docket no. 81 at 11. Defendant further argues prejudice in that any cross-examination of co-defendants will be impaired because he "will not be able to ask, in any credible way, whether" the co-defendants "are testifying to get a reduced sentence" or some other benefit. Finally, Defendant argues he is prejudiced in that if he had chosen to plead guilty when the indictment was issued, he would have had the option to provide information to the Government, availing himself of the "Safety Valve" in 18 U.S.C § 3553(f)(5). In sum, Defendant argues that any defense he might now proffer "will not be as robust as it would have been" without the delay. *Id.* at 12.

The Government responds by arguing that Defendant's prejudice arguments are speculative and that the defenses Defendant proffers he could have used are unviable defenses. Docket no. 84 at 15. For instance, the Government argues that whether Defendant could have provided information to receive a lesser sentence in 2004 is merely speculative and that "there is nothing to say it could still happen." *Id.* Or, as to Defendant's proffered argument that he was not actually present at the transaction and could have used phone records to prove that, the Government argues that this "assumes without any evidence that such records ever existed." *Id.* The Government makes the same argument as to Defendant's proffered defense that his lifestyle at the time could have shown he was not in a position to be part of a drug conspiracy; the Government

10

counters that "this [is] speculative" and "assumes that records ever existed." *Id.* at 16. As to Defendant's argument that he will be unable to properly cross-examine his co-defendants, the Government "has no idea where the co-defendants are" and that "there [are] no plans currently by the Government to call them as witnesses." *Id.* Finally, as to Defendant's argument that he could have cooperated against those co-defendants, the Government argues that "Defendant still has the opportunity to debrief" and provide information to qualify for a departure. *Id.*

Applying the *Barker* factors, the Court concludes that the Defendant's motion should be granted.  This is a close call.  Although greater efforts could have been made at locating the Defendant from 2005 to 2018, much of the difficulty resulted from differing agencies encountering the defendant using differing names and dates of birth.  This is not a case of "negligent prosecution" where the Defendant's case "falls through the cracks." The Government proffers sufficient reasons for the delay. Further, the Defendant does not meaningfully address why he delayed in the filing of this motion and whether he was diligent in asserting his Sixth Amendment right, but the Court does not place much emphasis on this factor.   The prejudice factor, however, weighs greatly in Defendant's favor. With regard to the prejudice factor, the length of delay is presumptively prejudicial.  *United States v. Molina-Solorio*, 577 F.3d 300, 305 (5th Cir. 2009). Ordinarily the burden is on the defendant to demonstrate actual prejudice.  *Id*. at 307.   But where the first three *Barker* factors together weigh heavily in the defendant's favor, a court may conclude that they warrant a presumption of prejudice, relieving the defendant of his burden.  *Id*.   Excusing the Defendant of the need to demonstrate actual prejudice, the Government has not persuasively rebutted that presumption of prejudice.  *Id*. at 308.

Alternatively, assuming the burden remains with the Defendant to establish prejudice, the

11

Defendant has established prejudice.   "The Supreme Court has stated that limiting the defendant's ability to prepare his case is the most serious of the three types of prejudice. *Barker*, 407 U.S. at 532, 92 S. Ct. 2182."   *United States v. Frye*, 489 F.3d 201, 212 (5th Cir. 2007).   Recently produced documents indicate that the Defendant's brother was using the Defendant's identity. The Defendant argues that because of the passage of time he is unable to procure phone records or other similar exculpatory evidence to establish that in 2004 he was not in the various locations described in the investigation of the drug conspiracy.   Though the Government argues that this is merely speculative, "consideration of prejudice is not limited to the specifically demonstrable." *Doggett v. United States*, 505 U.S. 647, 655, 112 S. Ct. 2686, 2692, 120 L. Ed. 2d 520 (1992). "*Barker* explicitly recognized that impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony 'can rarely be shown.'"   *Id*. In any event, this is not a case where the defendant offers mere speculation.   The Government has produced documents indicating that the Defendant's brother assumed his identity.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss his indictment for speedy trial violation (docket no. 81) is GRANTED.

It is so ORDERED.

SIGNED this 19th day of June, 2020.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

12